## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DR. SHANNON "SJ" JOSLIN,<br><br>           *Plaintiff*,<br><br>     vs.<br><br>U.S. DEPARTMENT OF THE<br>INTERIOR, *et al.*,<br><br>           *Defendants*. | Case No. 1:26-cv-576 |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR
## PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 2

I.     Factual Background ................................................................................ 2

    A.  History of Demonstrations at Yosemite ............................................ 2

    B.  First Amendment Regulations at Yosemite ...................................... 3

    C.  The Trump Administration's Hostility to Trans Rights and Speech ................................. 4

    D.  NPS's Selective Punishment of Dr. Joslin ...................................... 5

II.    Procedural Background ........................................................................ 8

LEGAL STANDARDS ...................................................................................... 8

ARGUMENT ...................................................................................................... 9

I.     Dr. Joslin is likely to succeed on the merits. ...................................... 9

    A.  Dr. Joslin's selective punishment was unconstitutional viewpoint discrimination. ............ 9

        1. Dr. Joslin was similarly situated to other demonstrators who were not punished. ....... 10

        2. The government's actions violated Dr. Joslin's First Amendment rights. ................... 11

        3. To the extent applicable, *Pickering* balancing favors Dr. Joslin. ............................... 13

    B.  This Court has jurisdiction to reinstate Dr. Joslin. .......................... 16

        1. This Court has jurisdiction because it is the only guaranteed path to judicial review. . 17

        2. Dr. Joslin does not need to exhaust administrative remedies. ...................................... 21

    C.  This Court has jurisdiction to enjoin criminal enforcement against Dr. Joslin. ............... 23

II.    The remaining preliminary injunction factors also support Dr. Joslin's request for preliminary relief. ................................................................ 26

    A.  Dr. Joslin will suffer irreparable harm absent immediate relief. ...................................... 26

    B.  The balance of equities strongly favors Dr. Joslin. ........................ 27

CONCLUSION .................................................................................................. 28

i

## TABLE OF AUTHORITIES

**CASES**                                                                  **PAGE**

*Am. Acad. of Pediatrics v. U.S. HHS*,
  2026 U.S. Dist. LEXIS 4584, at *76 (D.D.C. Jan. 11, 2026) ................................. 9

*Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984)........................................ 21

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610 (2020)................................ 13

*Branch Ministries v. Rossotti*, 211 F.3d 137 (D.C. Cir. 2000) ........................... 9

*Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716 (D.C. Cir. 2022) ...................... 8

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2007)...................... 27

*Coleman v. Napolitano*, 65 F. Supp. 3d 99 (D.D.C. 2014) ........................... 19

*Connick v. Myers*, 461 U.S. 138 (1983) ................................................ 12, 14

*Davis v. Billington*, 51 F. Supp. 3d 97 (D.D.C. 2014) ............................... 16–17, 19–20

*Davis v. District of Columbia*, 158 F.3d 1342 (D.C. Cir. 1998)................................ 26

*Dombrowski v. Pfister*, 380 U.S. 479 (1965) ................................... 25

*Elgin v. Department of Treasury*, 567 U.S. 1 (2012) ............................ 19–20

*Elrod v. Burns*, 427 U.S. 347 (1976)........................................ 21

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)................................ 23

*Fenico v. City of Philadelphia*, 70 F.4th 151 (3d Cir. 2023)........................ 16

*Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150 (D.C. Cir. 1982) ...................... 18

*Frederick Douglass Found., Inc. v. District of Columbia*,
  82 F.4th 1122 (D.C. Cir. 2023)......................................... 2, 9–13, 25–26

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)......................... 20, 22, 24

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) .................. 16

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ........................................ 13–14

**CASES (continued)**                                                                    **PAGE**

*Green v. U.S. Dep't of Just.*, 111 F.4th 81 (D.C. Cir. 2024) ........................................ 11

*Green v. U.S. Dep't of Just.*, 54 F.4th 738 (D.C. Cir. 2022) ...................................... 8

*Henry v. First Nat'l Bank of Clarksdale*, 595 F.2d 291 (5th Cir. 1979) ....................... 12

*Hubbard v. EPA*, 949 F.2d 453 (D.C. Cir. 1991) ...................................................... 15

*Hubbard v. U.S. EPA Adm'r*, 809 F.2d 1 (D.C. Cir. 1986) ......................................... 22

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 585 U.S. 878 (2018) .............. 12, 15

*Joelner v. Vill. of Wash. Park*, 378 F.3d 613 (7th Cir. 2004) ..................................... 8

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) ............................................ 14

*Lamb v. Holder*, 82 F. Supp. 3d 416 (D.D.C. 2015) ................................................. 19

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ........ 8, 26

*McCarthy v. Madigan*, 503 U.S. 140 (1992) .............................................................. 21

*Meese v. Keene*, 481 U.S. 465 (1987) ...................................................................... 23

*Milliken v. Bradley*, 433 U.S. 267 (1977) ................................................................. 25

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009) .................................. 21

*Mount Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) .............................. 22

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ......................................... 12

*Nat'l Ass'n of Broadcasters v. FCC*, 147 F.4th 978 (D.C. Cir. 2025) ......................... 11

*Nat'l Treasury Emps. Union v. King*, 961 F.2d 240 (D.C. Cir. 1992) ...................... 21, 22

*New York State Ophthalmological Soc. v. Bowen*, 854 F.2d 1379 (D.C. Cir. 1988) ...... 23

*Noble v. Cincinnati & Hamilton County Public Library*, 112 F.4th 373 (6th Cir. 2024) ....... 15–16

*NRA v. Vullo*, 602 U.S. 175 (2024) ......................................................................... 9

*Ord v. District of Columbia*, 587 F.3d 1136 (D.C. Cir. 2009) .................................... 25

**CASES (continued)**                                                                                  **PAGE**

*Peace Ranch, LLC v. Bonta*, 93 F.4th 482 (9th Cir. 2024)............................................................ 24

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563 (1968)............................. 9, 14

*Price v. Garland*, 45 F.4th 1059 (D.C. Cir. 2022)..................................................................... 13

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016) ......................... 8, 9, 21, 26, 27

*Rankin v. McPherson*, 483 U.S. 378 (1987)................................................................................ 15

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ..................................................................... 12, 16

*Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707 (9th Cir. 2022) ......................................... 15

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) .............................. 13

*San Diego v. Roe*, 543 U.S. 77 (2004) ....................................................................................... 12

*Schiff v. U.S. Off. of Pers. Mgmt.*, 784 F. Supp. 3d 380 (D. Mass. 2025) .................................... 13

*Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974) ...................................... 24

*Snyder v. Phelps*, 562 U.S. 443 (2011) ....................................................................................... 12

*Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988)................................................................ 17, 19

*Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69 (2013) ................................................................. 24

*Stand With US Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1 (1st Cir. 2025) ................ 12

*Steadman v. Governor, U.S. Soldiers' and Airmen's Home*, 918 F.2d 963 (D.C. Cir. 1990)......... 21

*Steffel v. Thompson*, 415 U.S. 452 (1974)................................................................................... 24

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ...................................................... 23, 24

*Suzal v. Dir., U.S. Info. Agency*, 32 F.3d 574 (D.C. Cir. 1994) .................................................... 19

*United States v. Fausto*, 484 U.S. 439 (1988) ............................................................................. 20

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995)...................................... 14, 21

*Wayte v. United States*, 470 U.S. 598 (1985) ............................................................................. 10

iv

**CASES (continued)**                                                                          **PAGE**

*Weaver v. U.S. Info. Agency*, 87 F.3d 1429 (D.C. Cir. 1996) ...................................... 14, 17–19, 21

*Webster v. Doe*, 486 U.S. 592 (1988) ........................................................................... 16–17, 20

*Woodhull Freedom Found. v. United States*, 948 F.3d 363 (D.C. Cir. 2020)......................... 23–24

**STATUTES:**

5 U.S.C. § 1214(a)(1)(A) ........................................................................................................ 17

5 U.S.C. § 1214(a)(1)(D) ........................................................................................................ 18

5 U.S.C. § 1214(b)(2)(B) ........................................................................................................ 18

5 U.S.C. § 1214(b)(2)(C) ........................................................................................................ 18

5 U.S.C. § 1214(b)(3)(B) ........................................................................................................ 18

5 U.S.C. § 1214(c) ................................................................................................................... 20

5 U.S.C. § 1214(c)(1) .............................................................................................................. 18

5 U.S.C. § 2302(a) .................................................................................................................. 17

5 U.S.C. § 7513(d) .................................................................................................................. 17

5 U.S.C. § 7703(a) .................................................................................................................. 17

5 U.S.C § 7511(a)(1)(A) ......................................................................................................... 17

18 U.S.C. § 1865(a) ................................................................................................................... 4

18 U.S.C. § 3559 ....................................................................................................................... 4

18 U.S.C. § 3571 ....................................................................................................................... 4

54 U.S.C. § 100751(a) ............................................................................................................... 4

54 U.S.C. § 100751(c) ............................................................................................................... 4

**REGULATIONS**

36 C.F.R. § 1.3 .......................................................................................................................... 4

**REGULATIONS (continued)**                                              **PAGE**

36 C.F.R. § 1.5 ........................................................................................................ 4

36 C.F.R. § 2.51 ...................................................................................... 3, 6, 25, 27

36 C.F.R. § 2.51(a) ................................................................................................ 3

36 C.F.R. § 2.51(c) ........................................................................................... 3, 25

83 Fed. Reg. 2065 .................................................................................................. 3

75 Fed. Reg. 64148 ................................................................................................ 4

## INTRODUCTION

For decades, climbers of all political stripes have shared messages from El Capitan (El Cap), the iconic rock formation in the heart of Yosemite National Park (Yosemite).  Support for political causes, expressions of personal identity, and simple messages to friends and family have taken turns dotting the rock face.  The National Park Service (NPS) never punished anyone for hanging flags of all sizes—that is, until Dr. Shannon "SJ" Joslin, together with a group of climbers, hung a trans pride flag.  This time, NPS fired Dr. Joslin and began investigating, in concert with the Department of Justice (DOJ), criminal penalties.  That selective punishment was viewpoint discrimination in violation of the First Amendment.  Dr. Joslin therefore moves for a preliminary injunction reversing the agency's decision to terminate and enjoining criminal investigation against Dr. Joslin for this or similar future conduct.[1]

The rights of trans people have long been a subject of intense public attention and concern. Following in an established tradition of bringing flags up El Cap, Dr. Joslin—a wildlife biologist for Yosemite who studies bat genetics—climbed the cliff with some friends and colleagues to spread a trans pride flag in support of the their community to ensure they felt welcome in the national parks.  After less than three hours, Dr. Joslin and the team took down the flag.  The display took place entirely while Dr. Joslin was off-duty, with no connection drawn between the display and Dr. Joslin's work for the park.

Apparently for the first and only time, NPS and DOJ aggressively responded to a flag on El Cap.  First, NPS summarily fired Dr. Joslin, who was a probationary employee at that time. Then, the government began a *criminal* investigation into the flag display.  Other consequences

---

[1] Dr. Joslin moves only as to the complaint's First Amendment claims (Counts I & II).  *See* ECF No. 1.

have since ensued.  The only justification NPS offered was that Dr. Joslin had "participated in a small group demonstration in an area outside the designated protest and demonstration area without a permit."  But that was pretext.  In truth, the government's selective enforcement of its regulation against Dr. Joslin's display (assuming Dr. Joslin even violated the regulation) was motivated by its content:  support for trans rights, which the Trump Administration, including NPS since inauguration, has relentlessly attacked.

These actions against Dr. Joslin violate the First Amendment.  Although the government may be able to enforce some speech restrictions at Yosemite, "selective enforcement of a neutral and facially constitutional law may run afoul of the First Amendment if the government's prosecutorial choices turn on the content or viewpoint of speech."  *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023).  That is the case here.

The Defendants' likely counterarguments are unavailing.  The administrative channeling arguments that the government often advances in cases brought by federal employees do not apply to constitutional cases where, as here, there is no path to judicial review available through Civil Service Reform Act (CSRA) channels.  On criminal enforcement, Dr. Joslin can readily establish standing, and injunctions are proper in First Amendment cases like this one.  On both fronts, the loss of First Amendment rights for even a short time constitutes irreparable harm.  And the balance of the equities clearly favors Dr. Joslin.

## BACKGROUND

### I.    Factual Background

#### A.    History of Demonstrations at Yosemite

Yosemite has long been a hub for activism.  Wydman Decl., Exs. 1, 2, 3, 4; Joslin Decl. 2. Displays on El Cap, one of Yosemite's most iconic landmarks (Wydman Decl., Ex. 5), are core to

that history.  Activity around El Cap is so common that media has sprung up just to cover it:  for over two decades, "Yosemite Icon" Tom Evans maintained a seasonal climbing blog, the "El Cap Report," that tracked the daily happenings of the famous rock formation.  Wydman Decl., Exs. 6, 7.  The El Cap Report documented scores of messages displayed from flags or banners, from support for Yosemite Medical Clinic (Wydman Decl., Ex. 8) to a birthday wish to Evans himself (Wydman Decl., Exs. 9, 10).

More recently, this natural billboard has been the site of political protest on a range of issues, including climate change (Wydman Decl., Ex. 11) and the Israel Palestine conflict (Wydman Decl., Ex. 12).  Just three months before Dr. Joslin displayed the trans pride flag, another group of employees displayed an upside-down American flag to protest staffing cuts at national parks.  Wydman Decl., Ex. 13.  As one NPS employee explained, the climbers sought to "bring[] attention to what's happening in the parks, which are every American's properties[.]"  Wydman Decl., Exs. 14, 29, 30.  As far as Dr. Joslin is aware, none of these instances were punished in any way.  Joslin Decl. 2.

### B.    First Amendment Regulations at Yosemite

Officials at Yosemite relied on 36 C.F.R. § 2.51 to punish Dr. Joslin.  Joslin Decl., Ex. C, at 1.  That regulation limits "demonstrations," defined as "conduct that involve[s] the communication or expression of views or grievances . . . which is reasonably likely to attract a crowd or onlookers."  36 C.F.R. § 2.51(a).  Under the rule, subject to various permitting rules, demonstrations are allowed in "designated available park areas," 36 C.F.R. § 2.51(c), which do not include El Cap.  Wydman Decl., Ex. 15, at 42.  The current version of the regulation has been in place since 2018, *see* 83 Fed. Reg. 2065, 2068, and a regulation that similarly limited

demonstrations to specified areas has been in place since at least 2010, *see* 75 Fed. Reg. 64148, 64153.

The day after Dr. Joslin's display, Yosemite revised its "Superintendent's Compendium," which sets forth the policies governing "the proper management, protection, government and public use" of the park. Wydman Decl., Ex. 15, at 1, Ex. 16. The Compendium is a compilation of the federal laws and regulations "governing the use and enjoyment of all the areas of the National Park System." *See* Wydman Decl., Ex. 15, at 1; 36 C.F.R. § 1.5; *see* 54 U.S.C. § 100751(a). This revised compendium, for the first time, included an explicit permit requirement for "any banner, flag, or sign larger than fifteen square feet." Wydman Decl., Ex. 15, at 23–24. The new rule applies "in designated Wilderness and Potential Wilderness Addition portions of the park," which comprise over 94% of the park, including El Cap. *Id.*; Wydman Decl., Ex. 17. Oddly, the new rule was backdated, apparently in an attempt to capture Dr. Joslin's conduct. Wydman Decl., Exs. 15, 16.

Violations of any NPS regulation, including those in the Compendium, purport to carry the same penalty: a fine as provided by law of up to $5,000 for individuals or $10,000 for organizations (18 U.S.C. § 3571), or by imprisonment not exceeding six months (18 U.S.C. § 3559), or both, in addition to covering all court costs associated with any court proceedings. *See* 36 C.F.R. § 1.3; 54 U.S.C. § 100751(c) (both citing 18 U.S.C. § 1865(a)).

## C.     The Trump Administration's Hostility to Trans Rights and Speech

Since the beginning of President Trump's second term, the federal government writ large has demonstrated sustained hostility toward the LGBTQ+ community, with a particular animus toward trans people. President Trump's first executive orders of his second term included attacks on trans people's identity, military service, access to health care, access to education, access to

4

bathrooms, and access to sports.  The results of these orders have been devastating to the LGBTQ+ community.  For example, the Department of State now issues passports based only on a person's sex assigned at birth; the Department of Health and Human Services replaced former Assistant Secretary of Health Admiral Rachel Levine's legal name with her deadname in the permanent institutional display, where her picture hangs as the first openly trans government official confirmed by the Senate; and federal employees have been fired or denied retirement benefits due to their support of or membership in the LGBTQ+ community.[2]

NPS has followed suit.  In the months leading up to Dr. Joslin's punishment, NPS scrubbed its webpage documenting the history and significance of the Stonewall Uprising, a watershed moment in the fight for LGBTQ+ rights.  That uprising led to the dedication of the Stonewall National Monument which, as the first U.S. landmark dedicated to LGBTQ+ rights and history, is managed by NPS.  Specifically, the website erased any mention of trans people, including removing the "T" from the acronym "LGBTQ."  Wydman Decl., Ex. 18.  Federal officials also removed the pride flag from the monument site, which local officials have since replaced. Wydman Decl., Ex. 19.

### D.    NPS's Selective Punishment of Dr. Joslin

On May 20, 2025, Plaintiff Shannon "SJ" Joslin—a nonbinary wildlife biologist at Yosemite—together with a group of trans, queer, and allied climbers scaled El Cap to unfurl a trans pride flag.  Joslin Decl. 4–5.  The group took the flag down on their own volition after less than three hours, during which the flag did not block any climbers or climbing routes.  It was hung on ropes affixed to the rockface with the same temporary climbing equipment used by thousands of

---

[2] The Human Rights Campaign released a brief following President Trump's first 100 days in office documenting the many ways in which the Administration has targeted LGBTQ+ speech.  Wydman Decl., Ex. 32.

climbers on that wall, and did no damage.  The group's intention was to communicate the flag display to the public through photographs on social media, which were later the subject of media stories.  *Id.*  Dr. Joslin explained that the group "[r]ais[ed] this flag in the heart of El Cap" as "a celebration of [their] community standing in solidarity with each other and all targeted groups," to show that "[t]rans existence is not up for debate" and that "[b]eing trans is a natural, beautiful part of human and biological diversity."   Joslin Decl. 7; Wydman Decl., Ex. 20.  All of Dr. Joslin's expressive activity took place during off-duty hours, and Dr. Joslin never identified themself as a Yosemite employee, nor did their colleagues participating in the climb.  Dr. Joslin never suggested, and indeed made all available efforts to disclaim, that the demonstration reflected any position held by the park, nor that it was at all affiliated with their NPS employment.  Wydman Decl., Exs. 21, 22; Joslin Decl. 8–9.

About a week later, Defendants notified Dr. Joslin that they were under investigation for their participation in the May 20 display and, after a series of interviews, Dr. Joslin received a termination notice.  Joslin Decl. 10–11.  The notice stated that Dr. Joslin "failed to demonstrate acceptable conduct" when they "participated in a small group demonstration in an area outside the designated protest and demonstration area without a permit as required by 36 C.F.R. § 2.51 and thus circumvented rules applicable to all park visitors."[3]  Joslin Decl. 11, Ex. C.  As a result, the letter concluded, Dr. Joslin's "continued employment . . . at [Yosemite] is being terminated" with a "terminative effective date [of] August 12, 2025."  *Id.*; *see also* Joslin Decl., Ex. D.  Because Dr. Joslin was fired approximately four weeks before the end of their two-year probationary period,

---

[3] It is not clear that the display of the trans flag was a "demonstration," which is a defined term of art in the relevant regulation.  *See* 36 C.F.R. § 2.51.  The Court need not determine whether the regulation was actually violated to hold that it was selectively enforced.

Dr. Joslin did not have access to the Merit Systems Protection Board (MSPB) or to the Federal Circuit appeal that follows an MSPB proceeding.  Joslin Decl. 10.

Meanwhile, Defendants began criminally investigating Dr. Joslin.  At the beginning of an early in-person interview, NPS told Dr. Joslin that there was an active criminal investigation. Joslin Decl. 9.  And, to remove all doubt, NPS also told numerous media outlets that the agency, together with DOJ, was pursuing criminal penalties against the climbers.  Wydman Decl., Exs. 23 ("The agencies 'are pursuing administrative action against several Yosemite National Park employees and possible criminal charges against several park visitors who are alleged to have violated federal laws and regulations related to demonstrations,' National Park Service spokesperson Rachel Pawlitz said."), 24 ("[A]s most demonstrations require a permit, the U.S. Attorney's Office for the Eastern District of California 'is evaluating possible criminal charges based on a National Park Service investigation.'"), 25, 26.  Between the park's new ban on flags and the agency's heavy-handed punishment of Dr. Joslin, media attention on Yosemite's response dwarfed coverage of the original display.  AP News, the New York Times, New York Post, NBC News, CBS News, PBS, Newsweek, CNN, and various local outlets reported on Yosemite's actions.  Wydman Decl., Exs. 24, 25, 29, 33, 34, 35, 36, 37.

As a result of these actions, Dr. Joslin lost a dream job, along with significant wages and benefits, including health insurance, a critical resource because the stress of the situation has exacerbated multiple preexisting medical conditions.  Aside from tangible losses, Dr. Joslin has suffered a significant constitutional injury: freedom of expression in Dr. Joslin's favorite place, Yosemite, out of fear of continued targeting and escalating criminal enforcement.  While only Dr. Joslin has been targeted in this way, the attack has reverberated throughout the community, representing what Dr. Joslin explains as a warning to "all of the other federal employees that they

have to be silent and comply or they will be eliminated."  Wydman Decl., Exs. 23, 27.  In Dr. Joslin's words, "[i]t isn't just about one ranger.  It's about whether everyone has the right to speak freely in the United States."  Wydman Decl., Ex. 39.

## II.    Procedural Background

Dr. Joslin filed the operative complaint on February 23, 2026.  Dr. Joslin alleges that the federal government's punishment—both as it relates to employment and criminal penalties—constituted viewpoint discrimination in violation of the First Amendment and violated the Privacy Act.  Dr. Joslin now moves for preliminary relief on those First Amendment claims.  The Privacy Act claims are not included within the scope of this motion.

## LEGAL STANDARDS

"A party seeking a preliminary injunction must make a 'clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest.'" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)).  When the moving party seeks to enjoin the government, the final two factors—balancing the equities and the public interest—merge.  *Pursuing Am.'s Greatness*, 831 F.3d at 511.

Courts in this circuit apply a "sliding scale" approach, wherein "a strong showing on one factor could make up for a weaker showing on another."  *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (internal quotation marks omitted) (noting potential tension in case law but reserving the question of "whether the sliding-scale approach remains valid").  Specifically, "the likelihood of success 'will often be the determinative factor' in the preliminary injunction analysis."  *Pursuing Am.'s Greatness*, 831 F.3d at 511 (quoting *Joelner v. Vill. of Wash.*

*Park*, 378 F.3d 613, 620 (7th Cir. 2004)); *Green v. U.S. Dep't of Justice*, 54 F.4th 738, 745 (D.C. Cir. 2022) ("In First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis." (quoting *Pursuing Am.'s Greatness*, 831 F.3d at 511)). As for the public interest factor, "an injunction against the perpetuation of unconstitutional government action axiomatically favors the public interest." *Am. Acad. of Pediatrics v. U.S. HHS*, 2026 U.S. Dist. LEXIS 4584, at *76 (D.D.C. Jan. 11, 2026).

## ARGUMENT

**I.     Dr. Joslin is likely to succeed on the merits.**

> **A.     Dr. Joslin's selective punishment was unconstitutional viewpoint discrimination.**

Dr. Joslin's First Amendment claims are controlled by *Frederick Douglass Foundation, Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023). In that case, the D.C. Circuit held that prosecutors' decision to enforce a facially valid chalking ordinance against pro-life protestors, while not enforcing the same law against Black Lives Matter protestors, violated the First Amendment because it discriminated based on viewpoint. *Id.* at 1131; *see also NRA v. Vullo*, 602 U.S. 175, 198 (2024) ("[T]he First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech."). Dr. Joslin was subjected to similar selective action. To succeed on a selective enforcement claim, "a plaintiff must demonstrate (1) he was similarly situated in material respects to other individuals against whom the law was not enforced, and (2) the selective enforcement infringed a constitutional right." *Frederick Douglass*, 82 F.4th at 1136. Dr. Joslin satisfies both. Further, as to Dr. Joslin's claims as an employee, *Pickering* balancing favors Dr. Joslin. *See Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 565 (1968).

      1.    *Dr. Joslin was similarly situated to other demonstrators who were not punished.*

Individuals "are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *Frederick Douglass*, 82 F.4th at 1137 (quoting *Branch Ministries v. Rossotti*, 211 F.3d 137, 145 (D.C. Cir. 2000)). The goal is to "isolat[e] whether a decision turns on 'unlawful favoritism,' rather than lawful prosecutorial considerations." *Id.* In practice, courts compare the plaintiff with other individuals across "relevant prosecutorial factors," including "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)). On these standards, Dr. Joslin is similarly situated with multiple other individuals who were not punished for similar speech.

Given the long, documented history of displaying messages on El Cap and in Yosemite more broadly, *supra* at 2, there are unsurprisingly many similar displays that did not result in punishment. Three examples, all involving displays on El Cap, are highlighted here.

First, just three months before Dr. Joslin's display, a group that included park employees displayed an upside-down American flag. Displayed during "firefall," a natural phenomenon involving a colorful waterfall that attracts thousands of visitors specifically to El Cap each year (Wydman Decl., Ex. 28), the display was designed to protest cuts to NPS (Wydman Decl., Ex. 30). The incident garnered significant media coverage and the individuals involved were publicly identified in that coverage. Wydman Decl., Exs. 29, 30. Both Dr. Joslin's display and the upside-down flag were "about matters of public concern and sought to disseminate a political message," and they were "proximate in time." *Frederick Douglass*, 82 F.4th at 1138. Only Dr. Joslin was punished. "This lopsided prosecutorial response . . . does not comport with the deterrence value

or culpability associated with the number of protesters and the scope of defacement, suggesting improper selective enforcement." *Id.*

Second—zooming out to non-employees who displayed messages without facing criminal investigation—in June 2024, a group called "Climbers With Palestine" displayed a 25-foot-by-15-foot banner reading "Stop the Genocide." Wydman Decl., Ex. 12. This display was also proximate in time (less than a year before Dr. Joslin's display), and also about a matter of public concern. Again, no punishment followed. And third, in 2022 a group of climbers displayed a banner that read "War Should Be Against Climate Change." Wydman Decl., Ex. 11. Much the same, and again, no punishment.

Despite being "similarly situated" to these and other prior demonstrators such that there were "no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them," only Dr. Joslin was targeted. *See Frederick Douglass*, 82 F.4th at 1137–38. That owes to Defendants' disagreement with Dr. Joslin's pro-trans rights message. Indeed, the fact that it was only immediately following Dr. Joslin's display that the Park Compendium was changed to explicitly ban the type of flag display they engaged in, *supra* at 4, is also evidence that they were singled out for punishment, including a *post hoc* attempt to justify that punishment.

### 2. The government's actions violated Dr. Joslin's First Amendment rights.

Differential treatment under an otherwise neutral law violates the First Amendment when "the government's prosecutorial choices turn on the content or viewpoint of speech." *Frederick Douglass*, 82 F.4th at 1141. Thus, "content-based regulations are presumptively invalid" and "[r]estrictions based on viewpoint are especially invidious." *Id.* (cleaned up). "Ordinarily, content-based speech distinctions must survive strict scrutiny." *Nat'l Ass'n of Broadcasters v.*

*FCC*, 147 F.4th 978, 1000 (D.C. Cir. 2025); *see also Green v. U.S. Dep't of Just.*, 111 F.4th 81, 99 (D.C. Cir. 2024). Importantly, for a First Amendment selective enforcement claim, a plaintiff need not demonstrate "discriminatory intent" or "invidious purpose," as "[i]nnocent motives do not eliminate the danger of censorship." *Frederick Douglass*, 82 F.4th at 1144–45 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015)).

"[S]peech on public issues occupies the highest rung of the [hierarchy] of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 911 (1982)) (internal quotation marks omitted). Dr. Joslin's speech—the display of a trans pride flag—squarely relates to a matter of public concern, defined as "any matter of political, social, or other concern to the community" or "a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (first quoting *Connick*, 461 U.S. at 146, then quoting *San Diego v. Roe*, 543 U.S. 77, 83 (2004)); *see also Henry v. First National Bank of Clarksdale*, 595 F.2d 291, 303 (5th Cir. 1979) (explaining that "speech to protest [] discrimination is essential political speech lying at the core of the First Amendment."); *Claiborne Hardware Co.*, 458 U.S. at 911–12 (holding that nonviolent activity seeking to "bring about political, social, and economic change" is unequivocally protected by the First Amendment). Some of the messages that were not censored also involved matters of significant public concern. *See, e.g.*, *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 585 U.S. 878, 913 (2018) (listing "climate change" and "sexual orientation and gender identity" as "matters of profound value and concern to the public."); *Stand With US Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1, 13 (1st Cir. 2025) (holding that "the conflict in Gaza" was a "matter of public concern").

Because "[a]llowing the expression of one message while silencing another is quintessential viewpoint discrimination," *Frederick Douglass*, 82 F.4th at 1142, Defendants violated Dr. Joslin's First Amendment rights by excluding pro-trans rights messaging while allowing other views. Even treating Dr. Joslin's message differently from non-political messages, like the innocuous "happy birthday" message discussed above, is impermissible content-based discrimination. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (plurality opinion) (holding that law favoring "speech made for collecting government debt over political and other speech" was "a content-based restriction").

Such a distinction cannot survive strict scrutiny, or even lesser forms of scrutiny; NPS may well have a valid government interest for some speech restrictions within Yosemite and on El Cap, but they certainly have no valid interest in favoring other types of speech over pro-trans rights speech. *See Frederick Douglass*, 82 F.4th at 1143; *see infra* Section II.B. Relatedly, some First Amendment challenges would require a forum analysis, which considers the level of speech restriction allowable on different kinds of government property. *See Price v. Garland*, 45 F.4th 1059, 1067 (D.C. Cir. 2022). But that is unnecessary here because the government may not "discriminate against speech on the basis of its viewpoint" in the context of a limited forum, *see Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829–30 (1995), or even in an entirely nonpublic forum, *Price*, 45 F.4th at 1068. *See also Schiff v. U.S. Off. of Pers. Mgmt.*, 784 F. Supp. 3d 380, 393 (D. Mass. 2025) (granting preliminary injunction preventing government website from censoring research that included terms like "transgender" and "LGBTQ").

3.    *To the extent applicable,* Pickering *balancing favors Dr. Joslin.*

Although federal employees give up some personal freedom when they decide to serve their country, "[s]o long as employees are speaking as citizens about matters of public concern,

they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). To "account for the complexity associated with the interplay between free speech rights and government employment," the Supreme Court has articulated a two-step inquiry to determine whether a public employee's speech is protected under the First Amendment. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022). First, the court asks whether the employee "speaks as a citizen addressing a matter of public concern[.]" *Id.* at 528. If so, a court then "engage[s] in 'a delicate balancing of the competing interests surrounding the speech and its consequences.'" *Id.* (quoting *Garcetti*, 547 U.S. at 423). At least as to Defendants' employment-related actions, the Court must weigh "the interests of [Dr. Joslin], as a citizen, in commenting upon matters of public concern and the interest of [NPS], as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. Where, as here, the nature of the speech at issue falls squarely within the core interests protected by the First Amendment, Defendants' burden to show disruption is especially heavy. *Connick*, 461 U.S. at 152. Further, because Defendants do not act as an employer when pursuing criminal penalties, no *Pickering* balancing is necessary for relief related to criminal enforcement. *See Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1440 (D.C. Cir. 1996) (noting the "special authority of the government as employer" warranting *Pickering* balancing); *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 466 (1995) (distinguishing *Pickering* cases that "usually . . . involve[] disciplinary actions taken in response to a government employee's speech" from statutory enforcement against "the public at large").

First, Dr. Joslin spoke as a private citizen. As discussed, Dr. Joslin was off-duty at the time of the display, and did not attempt to speak in their capacity as a Yosemite employee, nor did they hold themselves out as affiliated with the park in any public manner, such as to the press or on

14

social media. And Dr. Joslin's speech was certainly not "performed pursuant to their official duties[.]" *Garcetti*, 547 U.S. at 421. Dr. Joslin's activity on El Cap on May 20 had nothing to do with their role as a wildlife biologist who, among other things, manages the park's wildlife data and bat program. Joslin Decl. 2. And second, Dr. Joslin's speech concerning "gender identity" is, as a matter of binding Supreme Court precedent, a "matter of profound value and concern to the public" that "occupies the highest rung of the hierarchy of First Amendment values." *Janus*, 585 U.S. at 913 (cleaned up).

With the first prong satisfied, Defendants cannot demonstrate that Dr. Joslin's interest in free speech was outweighed by interference with the agency's regular operations. *See Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Courts "give less weight to the government's concerns about the disruptive impact of speech outside the workplace context." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 726 (9th Cir. 2022). Because the speech was unrelated to Dr. Joslin's job responsibilities, Defendants cannot establish that Dr. Joslin, "by virtue of [their demonstration], could not perform the job of [wildlife biologist] with the [NPS] successfully." *Hubbard v. EPA*, 949 F.2d 453, 457 (D.C. Cir. 1991). In no way does Dr. Joslin's off-duty speech in support of a marginalized community they are a member of implicate, let alone jeopardize, their ability to, for example, maintain the terrestrial data critical to monitoring and protecting endangered species. *See id.*

Moreover, the case law is littered with examples of more disruptive, more vociferous speech that courts nevertheless found protected under *Pickering*. In *Noble v. Cincinnati & Hamilton County Public Library*, for example, a public library security guard reposted on his private Facebook page, in the wake of nationwide Black Lives Matter protests, an image emblazoned "All Lives Splatter" and "Nobody Cares About Your Protest," which depicted an SUV

running over protestors.  112 F.4th 373, 378 (6th Cir. 2024).  The security guard's Facebook page

included his position with the library.  *Id.*  The Sixth Circuit held the employee's speech was

protected and that his termination was unlawful.  *Id.* at 385.  Nor is outsized media attention

dispositive (particularly where much of the media attention was driven by the agency's response,

not the original speech).  In *Fenico v. City of Philadelphia*, the court considered the city's

punishment of several police officers after a "major online news organization" wrote an "expose"

on the officers' social media posts that the court deemed "offensive, racist, and violent."  70 F.4th

151, 153 (3d Cir. 2023).  The court nevertheless reversed the dismissal of the employees' First

Amendment claims and remanded to allow those claims to proceed.  *Id.* at 168.

Particularly in light of this negligible government interest, Dr. Joslin's interest prevails, so

their speech is protected by the First Amendment.

### B.     This Court has jurisdiction to reinstate Dr. Joslin.

Because plaintiffs must demonstrate jurisdiction as to each form of relief sought, *see*

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000), Dr. Joslin

addresses employment-related relief and criminal-related relief separately.  As to the government's

actions against Dr. Joslin as employer, standing is clear.  NPS fired Dr. Joslin and Dr. Joslin remains

without that job, all caused by the agency's First Amendment violation.  When federal workers

seek to vindicate constitutional rights, however, the government often argues that the claims must

instead proceed, if at all, through channels created by the CSRA.  This argument fails here for two

reasons.  First, because Dr. Joslin's claims are constitutional and the CSRA does not include a

guaranteed path to judicial review for probationary workers, the district court has jurisdiction.  And

second, administrative exhaustion poses no barrier to Dr. Joslin.

1.    *This Court has jurisdiction because it is the only guaranteed path to judicial review.*

The Supreme Court has long maintained a general presumption of judicial review for constitutional claims. *See Webster v. Doe*, 486 U.S. 592, 603 (1988) ("[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear."). *Webster*'s heightened standard applies to avoid "the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Davis v. Billington*, 51 F. Supp. 3d 97, 108 (D.D.C. 2014) (quoting *Webster*, 486 U.S. at 603). Applying *Webster*'s mandate, this Circuit has repeatedly explained that "our circuit's law affords [government] employees . . . a right to federal court review of their constitutional claims at the end of the line." *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1433 (D.C. Cir. 1996); *see also Spagnola v. Mathis*, 859 F.2d 223, 229–30 (D.C. Cir. 1988) (collecting cases).

Because Dr. Joslin was a probationary employee when they were fired, they are not guaranteed judicial review through CSRA channels.  Tenured employees may appeal their terminations to the Merit Systems Protection Board (MSPB).  5 U.S.C. § 7513(d).  If the employees are dissatisfied with the MSPB's decision on their personnel matter, they may appeal to the Federal Circuit.  5 U.S.C. § 7703(a), (b).  Probationary employees like Dr. Joslin, by contrast, are not allowed the "individual right to directly petition the MSPB[.]"  *Billington*, 51 F. Supp. 3d at 107; *see also* 5 U.S.C § 7511(a)(1)(A) (carving out individuals "serving a probationary . . . period" from the definition of "employee"); *see also* 5 U.S.C. § 1201.3(a)(3) (carving out "[t]ermination of probationary employment" from the MSPB's appellate jurisdiction other than narrow exceptions not relevant here).  Instead, Dr. Joslin's allegations of unconstitutional conduct by NPS—a "prohibited personnel practice" under the CSRA, *see* 5 U.S.C. § 2302(a), (b)(12)—must be routed through the Office of Special Counsel (OSC), *see* 5 U.S.C. § 1214(a)(1)(A).

Unlike the direct path to judicial review paved for "employees," the OSC process involves a byzantine series of discretionary OSC determinations, most of which end without any possibility of review by an Article III court.  Should the OSC decide not to pursue Dr. Joslin's complaint at the outset, the CSRA merely provides Dr. Joslin the opportunity to submit "written comments" on that decision.  *See* 5 U.S.C. § 1214(a)(1)(D).  Regardless, the process ends there.  A finding by OSC that the complaint is supported by the evidence fares little better.  While OSC "shall" report such a finding to the agency involved, the OSC need not include "recommendations for corrective action."  5 U.S.C. § 1214(b)(2)(B).  And if the agency fails to act on said finding, the OSC, and only the OSC, "*may* petition the [MSPB] for corrective action."  5 U.S.C. § 1214(b)(2)(C) (emphasis added); *see also Weaver*, 87 F.3d at 1433 (explaining that the CSRA merely "gives the OSC discretion whether to seek corrective action" to the MSPB).  Then, and only then, could Dr. Joslin play a role; if they desired, they could submit "written comments" to the MSPB, 5 U.S.C. § 1214(b)(3)(B), and only if the MSPB then issues a "final order or decision" could Dr. Joslin reach the Federal Circuit, 5 U.S.C. § 1214(c)(1).

This roundabout process owes to OSC's peculiar nature.  The "thrust" of petitions to OSC is "toward systemic, not individual problems in the federal merit [system]." *Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150, 162 (D.C. Cir. 1982).  "[T]he duties of the Special Counsel are not equivalent to those of an employees' advocate.  *Id.*  OSC can, for example, "make compromises with the agency involved, seek corrective action short of that requested by the complainant, and, we assume, refuse to pursue the case at all."  *Id.*  Thus, "the principal recourse for individual employees who have suffered cognizable injury from a personnel action is to a Chapter 77 appeal [to the MSPB]—and not to the office of Special Counsel."  *Id.* at 163.  But that process is not open to Dr. Joslin.

The D.C. Circuit has squarely held that the availability of OSC's discretionary review process does not strip district courts of jurisdiction to hear federal employees' constitutional claims. *Weaver*, 87 F.3d at 1433 ("Although the CSRA gives the OSC discretion whether to seek corrective action, our circuit's law affords employees in Weaver's position a right to federal court review of their constitutional claims at the end of the line."); *Spagnola*, 859 F.2d at 229–30 ("On the contrary, time and again this court has affirmed the right of civil servants to seek equitable relief against their supervisors, and the agency itself, in vindication of their constitutional rights."); *Suzal v. Dir., U.S. Info. Agency*, 32 F.3d 574, 586 (D.C. Cir. 1994) (Williams, J., concurring) ("[W]e have held that the district courts are open to challenges seeking equitable relief on constitutional grounds, at least when the CSRA does not provide an adequate alternative route to judicial review."); *see also Lamb v. Holder*, 82 F. Supp. 3d 416, 423 (D.D.C. 2015) (noting "the D.C. Circuit's expressed preference for keeping the courthouse doors open to federal employees raising constitutional claims").

Accordingly, courts in this district have allowed constitutional claims by federal employees to move forward when the employees did not have direct access to the MSPB. *Coleman v. Napolitano*, 65 F. Supp. 3d 99, 105 (D.D.C. 2014) ("[T]his Court has subject matter jurisdiction to hear the plaintiff's constitutional due process claim, which cannot be reviewed under the CSRA by the MS[PB] nor subsequently appealed to the Federal Circuit."); *Billington*, 51 F. Supp. 3d at 109 ("[I]n keeping with the longstanding law of this Circuit that favors permitting plaintiffs the opportunity to bring constitutional claims for injunctive relief in the district court, the Court finds that the CSRA does not bar this Court's jurisdiction to address the plaintiff's constitutional claims."). This Court should do the same.

Neither *Elgin v. Department of Treasury*, 567 U.S. 1 (2012), nor *United States v. Fausto*, 484 U.S. 439 (1988), defeat this logical approach. In *Elgin*, the Court found that the plaintiffs could not go directly to district court because they could press their claims through the MSPB process, such that "the CSRA does not foreclose all judicial review of petitioners' claims, but merely directs that judicial review shall occur in the Federal Circuit." 567 U.S. at 10. But because judicial review is not guaranteed through the OSC process, Dr. Joslin is not seeking "an *additional* avenue of review in the district court," *id.* at 12 (emphasis added), but rather a first and only avenue of review. *Accord Billington*, 51 F. Supp. 3d at 109 ("[T]he Court is unconvinced that the Supreme Court's *Elgin* decision has any effect other than to route the constitutional claims of civil servants who already have an administrative remedy to the Federal Circuit."). And *Fausto*, which held that an employee who did not have a remedy under the CSRA could not go to court instead, is inapposite because that case simply did not involve any constitutional claims, 484 U.S. at 440, which the Supreme Court has accorded a presumption of judicial review in *Webster* and its progeny, *see Webster v. Doe*, 486 U.S. 592, 603; *Billington*, 51 F. Supp. 3d at 108.

As a result of the nature of the OSC process, Dr. Joslin cannot meaningfully pursue their constitutional claims in federal court. Put simply, Dr. Joslin's administrative recourse "provides only for judicial review of [any final order or decision of the MSPB], and not every [OSC] action is encapsulated in a final [MSPB] order or [decision]." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 (2010); *see* 5 U.S.C. § 1214(c) ("Judicial review of any final order or decision of the [MSPB] under this section may be obtained by any employee, former employee, or applicant for employment adversely affected by such order or decision."). Accordingly, because Dr. Joslin has no guaranteed route to judicial review through CSRA channels, this court has jurisdiction to hear their constitutional claims.

2.    *Dr. Joslin does not need to exhaust administrative remedies.*

Nor must Dr. Joslin wait for the potentially lengthy OSC process to conclude before obtaining relief in federal court.  While the D.C. Circuit in *Weaver* noted that *the CSRA* included a jurisdictional administrative exhaustion obligation, that requirement only applies to *constitutional claims* when, as relevant here, "the CSRA remedy would have been fully effective in remedying the constitutional violation."  87 F.3d at 1433–34 (cleaned up).  That is consistent with other D.C. Circuit precedent.  *Steadman v. Governor, U.S. Soldiers' and Airmen's Home*, 918 F.2d 963, 967 (D.C. Cir. 1990) (quoting *Andrade v. Lauer*, 729 F.2d 1475, 1493 (D.C. Cir. 1984)); *see also Nat'l Treasury Emps. Union v. King*, 961 F.2d 240, 243 (D.C. Cir. 1992) (mandating exhaustion in the unfair labor practice context only where "the administrative process [is] fully capable of granting full relief").  But the CSRA process provides no such fully effective constitutional remedy here.

First, Dr. Joslin faces ongoing irreparable harm that, by definition, cannot be remedied by later relief through CSRA channels.  The loss of First Amendment "freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'"  *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).  Dr. Joslin is actively experiencing this harm, as they remain barred from their job for exercising their First Amendment rights, and in jeopardy of further criminal consequences, *see infra* at 26.  Without relief, this constitutional deprivation will continue.  *See Pursuing Am.'s Greatness*, 831 F.3d at 511.  By contrast, the court in *Weaver* explicitly held that the harm at issue— a mere oral admonishment—was "remediable under the CSRA."  87 F.3d at 1433.  Because Dr. Joslin "may suffer irreparable harm if unable to secure immediate judicial consideration of [their]

claim," *see infra* Section II.A, "[they] need not resort to the administrative remedy." *King*, 961 F.2d. at 244 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 147 (1992)).

Second, the OSC process is not effective for the reasons discussed above. The OSC process has little chance of effectively addressing the constitutional violation against Dr. Joslin, let alone in a timely manner. Indeed, when counsel for Dr. Joslin reached out to OSC for an update nearly two months after filing a complaint, an investigator responded that they were "experiencing delays in processing as we try to catch up from the government shut down and the large volume of complaints that have [been] filed." Wydman Decl., Ex. 38. Where such a process does not provide for "meaningful[]" pursuit of one's constitutional claims, exhaustion of said process is not required. *See Free Enter. Fund*, 561 U.S. at 490 (foregoing discussion of exhaustion in context of constitutional claims).

Again, *Weaver*'s discussion of the "effectiveness" of OSC, holding that it passed muster in that case, was colored by limited nature of the harm challenged by the plaintiff: a mere "oral admonishment." 87 F.3d at 1432. The Court thus credited the adequacy of the OSC process given "the relatively minor character of the wrongs whose redress it left to OSC discretion," considering the risk of "trivial" claims going to MSPB. *Id.* at 1434. There was no *ongoing* First Amendment injury resulting from the oral admonishment in *Weaver* that was creating *ongoing* irreparable harm, as is present here. There is, of course, nothing trivial about the harms experienced by Dr. Joslin, who was terminated mere weeks before becoming tenured, and who remains deprived of their government position. The "effectiveness" of the remedy must be analyzed in light of the harm, and the CSRA remedy is inadequate compared to the significant harm here.

Because Dr. Joslin's constitutional rights are not meant to be left to the whims of OSC's discretion, this Court has jurisdiction.

* * *

When it comes to remedy, where an adverse employment decision implicates an employee's constitutional rights, "[r]einstatement clearly is among those equitable remedies available[.]" *Hubbard v. U.S. EPA Adm'r*, 809 F.2d 1, 12 (D.C. Cir. 1986), *aff'd on reh'g sub nom. Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988) (relying on *Mount Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–84 (1977)). As such, this Court has jurisdiction to reinstate Dr. Joslin to their position of wildlife biologist in Yosemite.

### C.    This Court has jurisdiction to enjoin criminal enforcement against Dr. Joslin.

Because Dr. Joslin faces no CSRA-preclusion issue as to criminal enforcement, there is no need to analyze channeling or administrative exhaustion as to criminal-related relief. For this relief, Dr. Joslin has established standing, and thus the Court has jurisdiction to order relief.

To establish Article III standing, a plaintiff must demonstrate (1) injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) likelihood the injury will be redressed by a favorable decision. *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 370 (D.C. Cir. 2020). "Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements. So in those cases, standing is usually easy to establish." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024). And "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 381. This holds true for regulations backed by criminal penalties. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 152 (2014). And it holds true in this case.

As to the ongoing investigation, Dr. Joslin faces at least three injuries sufficient to establish standing. First, the investigation as a consummation of a First Amendment violation constitutes an injury in and of itself. *New York State Ophthalmological Soc. v. Bowen*, 854 F.2d 1379, 1385

(D.C. Cir. 1988) ("Where there is 'a legal right, the requisite injury for standing would be found in an invasion of that right.'" (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 224 n. 14 (1974))).  Second, the threat of prosecution is an injury.  *See Susan B. Anthony List*, 573 U.S. at 158–59.  And third, the government's public pursuit of criminal penalties, in statements to the press, creates a stigmatic injury.  *See Meese v. Keene*, 481 U.S. 465, 473 (1987).  There should be little doubt that these injuries were caused by the Defendants' initiation of a criminal investigation, and that an injunction blocking it would redress the harm.  Additionally, because this lawsuit concerns a federal (rather than state) investigation, and indictment does not appear imminent, the Court need not abstain from issuing an injunction.  *See Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013); *Steffel v. Thompson*, 415 U.S. 452, 462 (1974).

As to criminal enforcement for future conduct, "[c]ourts' willingness to permit pre-enforcement review is at its peak when claims are rooted in the First Amendment." *Woodhull Freedom Found.*, 948 F.3d at 371 (cleaned up).  To demonstrate injury in fact pre-enforcement, a plaintiff need only show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Id.* at 370 (quoting *Susan B. Anthony List*, 573 U.S. at 159).  "[A]n actual arrest, prosecution, or other enforcement action is not a prerequisite." *Susan B. Anthony List*, 573 U.S. at 158.

Dr. Joslin also has standing to obtain an injunction blocking future enforcement efforts.  First, Dr. Joslin has stated their intention to engage in similar expressive activity but for their fear of prosecution and further collateral consequences from government enforcement.  Specifically, Dr. Joslin has stated that "I am also unable to continue speaking out in the manner I want for fear of additional repercussions, including future criminal and administrative investigation and

24

punishment" and that "[i]f not for these potential consequences, I would engage in similar expressive activities." Joslin Decl. 12–13. That is enough for purposes of standing. As the Ninth Circuit explained, "a plaintiff need not plan to break the law[;] courts must ask whether the plaintiff would have the intention to engage in the proscribed conduct, were it not proscribed." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 488 (9th Cir. 2024); *see also Free Enter. Fund*, 561 U.S. at 490 ("We normally do not require plaintiffs to 'bet the farm' by taking the violative action before testing the validity of the law." (cleaned up)).

Second, that fear of prosecution is credible. Defendants' position appears to be that Dr. Joslin's conduct broke the law and warranted criminal investigation. Dr. Joslin's termination notice claims that Dr. Joslin violated 36 C.F.R. § 2.51. Joslin Decl., Ex. C. And Defendants told Dr. Joslin directly, and reiterated to the press, that criminal penalties were on the table. Defendants have never told Dr. Joslin that the existing investigation has concluded or that no charges would be brought, leaving them under the threat of criminal prosecution for the past flag display. It is reasonable to believe that a second offense would result in escalating enforcement, to include criminal charges. Because Defendants have previously "singled out or uniquely targeted" Dr. Joslin, they can be expected to do so again. *See Ord v. District of Columbia*, 587 F.3d 1136, 1140–42 (D.C. Cir. 2009).

Because this Court has jurisdiction and Dr. Joslin has standing, the court should fashion an appropriate remedy. "The nature of the [] remedy is to be determined by the nature and scope of the constitutional violation," and a court is within its broad equitable powers so long as "the remedy is tailored to cure the 'condition that offends the constitution[.]'" *Milliken v. Bradley*, 433 U.S. 267, 280, 282 (1977) (cleaned up). That remains true in a First Amendment selective enforcement case. *Frederick Douglass*, 82 F.4th at 1150 ("As we have recognized in the selective

enforcement context, courts have discretion to fashion injunctive relief.").  And although courts exercise caution when limiting prosecutorial discretion, "courts may review selective enforcement claims to assess whether the executive's choice of prosecution targets infringes on constitutional rights." *Id.* at 1137.  An injunction against criminal enforcement of 36 C.F.R. § 2.51 or the revised compendium against Dr. Joslin for pro-trans speech is a tailored cure.  *See, e.g.*, *Dombrowski v. Pfister*, 380 U.S. 479, 491 (1965) ("[T]hose affected by a statute are entitled to be free of the burdens of defending prosecutions, however expeditious, aimed at hammering out the structure of the statute piecemea[l], with no likelihood of obviating similar uncertainty for others.").

## II.    The remaining preliminary injunction factors also support Dr. Joslin's request for preliminary relief.

Because of Dr. Joslin's strong showing of likelihood of success on the merits, Dr. Joslin's arguments as to the remaining factors—irreparable harm absent relief and the balance of equities—are viewed "more favorably[.]"  *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).  With or without this boost, Dr. Joslin satisfies both additional factors.

### A.    Dr. Joslin will suffer irreparable harm absent immediate relief.

As discussed above, Dr. Joslin has already suffered, and will continue to suffer, irreparable injury if this Court does not award preliminary relief.  Given that the loss of First Amendment for even a short time constitutes irreparable harm, *Pursuing Am.'s Greatness*, 831 F.3d at 511, "a prospective violation of a constitutional right constitutes irreparable injury for [equitable relief] purposes." *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (internal citation omitted).  Relief is necessary to end the irreparable harm that Dr. Joslin continues to experience every day.  *See Pursuing Am.'s Greatness*, 831 F.3d at 511.

B.       **The balance of equities strongly favors Dr. Joslin.**

"[T]here is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation and, without a preliminary injunction, [Dr. Joslin] is unable to exercise those rights" on public property. *Pursuing Am.'s Greatness*, 831 F.3d at 511. Dr. Joslin's "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

While Dr. Joslin is not privy to the rationale behind 36 C.F.R. § 2.51—the regulation imposing the demonstration permit requirement and upon which Defendants based Dr. Joslin's termination—the Superintendent justified the flag ban in the May 21 Compendium update as, among other things, "necessary to . . . provide for an unimpaired visitor experience, protect natural and cultural resources in designated Wilderness and Potential Wilderness Addition portions of the park," as well as "to maintain public safety, as it prohibits draping items that could endanger and interfere with permitted or allowable unpermitted climbing activity."  Wydman Decl., Ex. 15, at 23–24.

Even accepting that these are worthwhile aims, selectively targeting protected speech—and terminating employment because of said speech—hardly effectuates these purposes.  The trans pride flag covered a negligible percentage—approximately 0.000069%—of the roughly 3,000-foot-tall rock formation, the face of which spans over a square mile, or almost 30 million square feet.  The flag was up for less than three hours, during which it did not block any climbing routes or climbers.  Wydman Decl., Ex. 32.  Given that the May 20 demonstration neither harmed El Cap nor "endanger[ed]" or "interfere[d] with . . . climbing activity," Defendants' interests fail to justify Dr. Joslin's termination.  Nor will an injunction "substantially injure other interested parties,"

27

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2007), as there is no injury to the government in forcing it stop infringing on citizens' First Amendment rights.

* * *

Dr. Joslin has established a strong likelihood of success on the merits, that they will suffer irreparable harm absent preliminary intervention, and that the balance of equities favors this relief, so Dr. Joslin is entitled to preliminary injunctive relief.

**CONCLUSION**

For the foregoing reasons, Dr. Joslin respectfully requests a preliminary injunction reinstating Dr. Joslin's employment and enjoining criminal enforcement against Dr. Joslin for speech at Yosemite supporting LGBTQ+ rights.

Dated: February 23, 2026                    Respectfully submitted,

                                             */s/ Clayton L. Bailey*
                                             Clayton L. Bailey (DC Bar No. 1644867)
                                             Margaret (Emmy) Wydman (DC Bar No. 9007646)
                                             **Civil Service Law Center LLP**
                                             1455 Pennsylvania Ave NW, Suite 400
                                             Washington, DC 20004
                                             (202) 571-7836
                                             cbailey@civilservicellp.com
                                             ewydman@civilservicellp.com

                                             Paula Dinerstein (DC Bar No. 333971)
                                             Joanna Citron Day* (DC Bar No. 477833)
                                             **Public Employees for Environmental
                                             Responsibility**
                                             962 Wayne Ave, Suite 610
                                             Silver Spring, MD 20910
                                             (202) 464-2293
                                             pdinerstein@peer.org
                                             jday@peer.org

                                             *application for admission pending per LCvR
                                             5.1(c)(2)

28